UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GIOVONNIE MAYO,<br><br>                    Plaintiff,<br><br>     -against-<br><br>CITY OF NEW YORK; LEVA GEVARGIZ; JOSEPH BURCKHARD; FERDI MEMEDOSKI; KONTI MARKVUKAJ; JOHN CHELL; NYPD Members of Service SUPERVISOR DOES #1-10; and NYPD Members of Service OFFICER DOES #1-30,<br><br>                    Defendants. | No. ___ Civ. ___<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff GIOVONNIE MAYO, by his attorneys, LIAKAS LAW, P.C., alleges as follows:

### PRELIMINARY STATEMENT

1.      The New York City Police Department ("NYPD") has a long history of stopping Black New Yorkers without legal justification. It has a long history of ramming New Yorkers with police cars. It has a long history of defaming victims of police violence. It has a long history of failing to discipline officers who have repeatedly committed serious civil rights violations, even when those officers have already cost New Yorkers their lives and millions of taxpayer dollars. It has a long history of trying to cover up its violence and mistakes.

2.      This case is about what happens when all these histories collide at once.

3.      On May 26, 2024, Plaintiff Giovonnie Mayo was standing on a sidewalk corner in Brooklyn when two unmarked police cars screeched up and four NYPD officers—Defendants Leva Gevargiz, Joseph Burckhard, Ferdi Memedoski, and Konti Markvukaj—rushed him for "nothing," as one witness characterized it. Mr. Mayo is Black. At the time, he was 29 years old.

4.      When Mr. Mayo fled this pretextual and terrifying stop, Defendants Gevargiz and Burckhard chased him down and ran him over with their police car, leaving him with permanent brain damage. For a long time, Mr. Mayo was unable to walk. He is still unable to speak.

5.      Surveillance footage shows Mr. Mayo standing on a sidewalk with his hands in the

air before the officers rammed him with their police car.

6.      Later that day—as Mr. Mayo underwent emergency brain surgery—the NYPD Chief of Patrol, Defendant John Chell, held a press conference where he slandered Mr. Mayo as a criminal who "displayed a firearm and pointed it at a female." The female in question can be heard on body-worn camera footage from the scene telling officers and anyone who will listen that "they came and stopped him for nothing, for nothing, we were talking," and not even Defendant Chell's co-defendants ever accused Mr. Mayo of doing this. After the conference, Defendant Chell posted a recording of his speech to his official NYPD social media account, broadcasting it to journalists and hundreds of thousands of followers.

7.      After sending Mr. Mayo to the hospital with a brain injury and defaming him, Defendants fabricated evidence and manufactured criminal charges against him. But the cover up did not stop there. For over 44 days—while Mr. Mayo lay hooked to a ventilator and unable to walk—Defendants handcuffed and shackled Mr. Mayo to his hospital bed on the self-evident fiction that he was a flight risk—all while refusing to arraign him and maintaining that his medical condition made him "un-arraign-able." During this time, a never-ending rotation of officers continually surveilled Mr. Mayo and his family from *inside* his hospital room, intruding on his family's grieving and conversations with doctors while constantly reporting Mr. Mayo's prognosis back to their anxious superiors.

8.      Defendants did not abandon their efforts to prosecute Mr. Mayo until July 9, 2024, after a representative of the Kings County District Attorney visited Mr. Mayo's bedside. And even then, the NYPD tried to have Mr. Mayo transferred from a private hospital to Bellevue Hospital Prison Ward, where incarcerated individuals in the custody of the New York City Department of Correction are typically confined and the NYPD could continue to closely monitor him.

9.      All of this was both inevitable and entirely preventable. Few cases better illustrate the NYPD's systemic failure to discipline its "bad apples" than Mr. Mayo's.

10.     Between them, Defendants Gevargiz, Burckhard, Memedoski, and Markvukaj have

been sued for a wide array of civil rights violations in at least 29 separate lawsuits. Those 29 lawsuits have cost New Yorkers over $2.7 million in settlements alone. The four officers have also collectively amassed over 50 civilian allegations before the Civilian Complaint Review Board, with Black and Latinx New Yorkers repeatedly accusing the officers of calling them racial epithets and slamming their heads into walls.

11.     In 2016—eight years before he and Defendant Gevargiz rammed Mr. Mayo with their police car—a civil jury found Defendant Burckhard guilty of excessive force for shooting a Black man in 2011. The next year, another civil jury found Defendant Chell guilty of excessive force for shooting a Black man in the back in 2008, after necessarily rejecting Defendant Chell's sworn testimony to the effect that he had accidently discharged his firearm with pin-point accuracy.

12.     The NYPD continues to employ Defendants Gevargiz, Burckhard, Memedoski, Markvukaj, and Chell. Defendant Chell was promoted to Chief of Department in January 2025, the highest uniformed rank in the NYPD.

13.     Mr. Mayo brings this lawsuit to demand accountability—for himself, and for the myriad other Black New Yorkers killed and injured by NYPD officers who should have been terminated long ago. He seeks monetary damages, injunctive relief, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

14.     This Court has original subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

15.     Venue is properly laid in the Eastern District of New York because the acts and omissions described occurred in Brooklyn.

## JURY DEMAND

16.     Plaintiff demands a jury trial on all claims.

**COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW**

17.    Plaintiff served his Notice of Claim upon the City of New York ("City") by electronic delivery as prescribed by the Office of the New York City Comptroller on August 21, 2024, within 90 days of the accrual of his claims.

18.    On August 21, 2024, the City acknowledged receipt of Plaintiff's Notice of Claim and assigned it claim number 2024-PI-027529.

19.    On January 9, 2025, the City conducted a hearing pursuant to § 50(h) of the General Municipal Law.

20.    More than 30 days have elapsed since Plaintiff served his Notice of Claim and the City has not adjusted or paid Plaintiff's claims.

21.    This action is filed within one year and 90 days of the events giving rise to Plaintiff's claims.

22.    Any and all other prerequisites to filing this action have been met, and Plaintiff will timely serve a copy of this complaint upon the New York City Commission on Human Rights in compliance with N.Y.C. Admin. Code § 8-502.

**PARTIES**

23.    Plaintiff GIOVONNIE MAYO is a resident of Brooklyn. He is a 30-year-old Black man.

24.    Defendant CITY OF NEW YORK ("CITY") is municipal corporation organized under the laws of the State of New York. Defendant City is authorized by law to maintain a police department and maintains the New York City Police Department ("NYPD"). The NYPD acts as Defendant City's agent and Defendant City assumes the risks incidental to the maintenance of the NYPD and the employment of its personnel.

25.    At all relevant times, Defendant City was responsible for enforcing the rules of the NYPD and for ensuring that NYPD personnel obey the laws of the United States, the State of New York, and the City of New York.

4

26.     Defendant LEVA GEVARGIZ was, at all relevant times, an NYPD officer employed by Defendant City holding the rank of detective. He has been employed by the NYPD since 2007. His badge number is 615 and his tax identification number is 944590.

27.     Defendant JOSEPH BURCKHARD was, at all relevant times, an NYPD officer employed by Defendant City holding the rank of sergeant. He has been employed by the NYPD since 2006. His badge number is 1330 and his tax identification number is 941371.

28.     Defendant FERDI MEMEDOSKI was, at all relevant times, an NYPD officer employed by Defendant City holding the rank of detective. He has been employed by the NYPD since 2006. His badge number is 6508 and his tax identification number is 942190.

29.     Defendant KONTI MARKVUKAJ was, at all relevant times, an NYPD officer employed by Defendant City holding the rank of detective. He has been employed by the NYPD since 2014. His badge number is 6254 and his tax identification number is 956883.

30.     At all relevant times, Defendants Gevargiz, Burckhard, Memedoski, and Markvukaj (collectively, the "**Officer Defendants**") acted under color of law and in the course and scope of their duties and authority as officers, agents, servants, and employees of Defendant City, or were otherwise engaging in conduct incidental to the performance of their lawful functions in the course of exercising said duties and authority.

31.     The Officer Defendants are sued in their individual capacities.

32.     Defendant JOHN CHELL was, at all relevant times, an NYPD official employed by Defendant City holding the rank of Chief of Patrol, a position to which he was promoted in December 2022. Defendant Chell was subsequently promoted to Chief of Department in January 2025. He has been employed by the NYPD since 1994 and his tax identification number is 905942.

33.     At all relevant times, Defendant Chell acted under color of law and in the course and scope of his duties and authority as an officer, agent, servant, and employee of Defendant City, or was otherwise engaging in conduct incidental to the performance of his lawful functions in the course of exercising said duties and authority.

34. At all relevant times, Defendant Chell had policymaking authority over the NYPD and primary responsibility for NYPD patrol operations, particularly operations involving stops of civilians on public streets and sidewalks.

35. Defendant Chell is sued in his individual capacity.

36. Defendants OFFICER DOES #1-30 (collectively, the "**Doe Officers**") were, at all relevant times, NYPD members of service or other individuals employed by Defendant City. Their names are not currently known.

37. The Officer Defendants may also be Doe Officers.

38. The Doe Officers unlawfully held Plaintiff in indefinite custody for over 44 days without due process and in unconstitutional conditions of confinement while refusing to arraign him, including by handcuffing and shackling Plaintiff to his bed and intimately surveilling him from inside his hospital room.

39. Defendants SUPERVISOR DOES #1-10 (collectively, the "**Doe Supervisors**"; collectively with the Doe Officers, the "**Doe Defendants**") were, at all relevant times, NYPD members of service or other individuals employed by Defendant City. Their names are not currently known.

40. Defendant Chell may also be a Doe Supervisor.

41. The Doe Supervisors held or ordered the Doe Officers to unlawfully hold Plaintiff in indefinite custody for over 44 days without due process and in unconstitutional conditions of confinement while refusing to arraign him, including by ordering the Doe Officers to handcuff and shackle Plaintiff to his bed and intimately surveil him from inside his hospital room, or ratified the same.

42. The Doe Defendants are sued in their individual capacities.

43. At all relevant times, the Doe Defendants acted under color of law and in the course and scope of their duties and authority as officers, agents, servants, and employees of Defendant City, or were otherwise engaging in conduct incidental to the performance of their lawful

functions in the course of exercising said duties and authority.

44.     At all relevant times, Defendants violated Plaintiff's clearly established rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution by and through acts and omissions that reasonable law enforcement officers in their circumstances would have known were violations of Plaintiff's rights, including by failing to intervene in, prevent, or otherwise limit the unconstitutional conduct of their co-defendants.

## FACTS

### *The Officer Defendants Ram Plaintiff with Their Police Car*

45.     On May 26, 2024, at approximately 3:30 a.m., Plaintiff was standing on the sidewalk in front of 701 Ralph Avenue in Brooklyn, near the intersection of Ralph Avenue and Sutter Avenue.

46.     Plaintiff was talking to a woman.

47.     Two unmarked police cars approached, "screeching" up as the woman described it.

48.     One unmarked police car was occupied by Defendants Gevargiz and Burckhard and the other by Defendants Memedoski and Markvukaj.

49.     The Officer Defendants exited their unmarked police cars.

50.     Without warning, reasonable suspicion, probable cause, or other legal justification, the Officer Defendants, acting in concert, attempted to seize and assault Plaintiff.

51.     Plaintiff fled this pretextual, unlawful, and terrifying stop.

52.     Defendants Memedoski and Markvukaj pursued Plaintiff on foot.

53.     Defendants Gevargiz and Burckhard pursued Plaintiff in their police car, a 2023 Honda sedan that is owned or leased by Defendant City.

54.     Defendants Gevargiz drove while Defendant Gevargiz was the front-seat passenger or "recorder."

55.     Defendants Gevargiz and Burckhard drove at high speeds.

56.    Defendants Gevargiz and Burckhard caught up with Plaintiff roughly a block away from the spot they initially encountered him.

57.    Defendant Burckhard pointed his firearm at Plaintiff out the passenger side window.

58.    In response, Plaintiff put his hands in the air, stopped running, and submitted to the Officer Defendants' authority.

59.    Figure 1 is a true and accurate screenshot of a surveillance video from 1212 East New York Avenue depicting Plaintiff seized with his hands in the air. The blue and red circles, showing Plaintiff and the police car occupied by Defendants Gevargiz and Burckhard, respectively, have been added by Plaintiff's counsel.



*Figure 1*

60.    Figure 2 is a cropped version of the same screenshot depicting Plaintiff seized with his hands in the air.



*Figure 2*

61.     While Plaintiff stood seized with his hands in the air, Defendants Gevargiz and Burckhard drove their police car onto the sidewalk where Plaintiff was standing.

62.     While Plaintiff stood seized with his hands in the air, Defendants Gevargiz and Burckhard rammed their police car into Plaintiff and ran him over.

63.     Defendants Gevargiz and Burckhard accelerated their police car prior to ramming into Plaintiff and running him over.

64.     Figure 3 is four screenshots of the same surveillance video showing Defendants Gevargiz and Burckhard driving their police car onto the sidewalk where Plaintiff was standing with his hands in the air while being held at gunpoint and ramming into him. The blue and red circles have been added by Plaintiff's counsel.



*Figure 3*

65.    Defendants Gevargiz and Burckhard intentionally struck Plaintiff with their police car and ran him over.

66.    Defendants Gevargiz and Burckhard struck Plaintiff with their police car and ran him over to punish him for fleeing.

67.    After ramming Plaintiff with their police car and running him over, Defendants Gevargiz and Burckhard reversed their police car back over Plaintiff.

68.    Figure 4 is two screenshots from the same surveillance video showing Defendants Gevargiz and Burckhard reversing their police car approximately five to ten feet after running Plaintiff over. The red circles have been added by Plaintiff's counsel.



*Figure 4*

69.     Defendants Gevargiz and Burckhard knew or should have known that using a police car to strike someone can seriously injure or kill them.

70.     Defendants Gevargiz and Burckhard had no legal justification to use force against Plaintiff, let alone deadly force, when they rammed him with their police car and ran him over.

71.     Before Defendants Gevargiz and Burckhard used this deadly force on Plaintiff, they could clearly see that Plaintiff had his hands in the air and did not have a weapon.

72.     Before Defendants Gevargiz and Burckhard used this deadly force on Plaintiff, they could clearly see that Plaintiff did not pose a threat to them or anyone else.

73.     Before Defendants Gevargiz and Burckhard used this deadly force on Plaintiff, they could clearly see that Plaintiff had stopped running.

74.     Before Defendants Gevargiz and Burckhard used this deadly force on Plaintiff, they could clearly see that Plaintiff had submitted to their authority.

75.     Plaintiff sustained severe head trauma and a permanent brain injury.

76.     After ramming Plaintiff with a police car, the Officer Defendants handcuffed behind his back despite the fact he was severely injured, unable to move, and bleeding from the head.

77.     Plaintiff was taken to Brookdale University Hospital by ambulance sometime after being handcuffed.

### Defendants Lie to Investigators and Fabricate Evidence

78.     After running Plaintiff over with a police car, the Officer Defendants, acting jointly and in concert with Defendant Chell and the Doe Defendants, conspired to cover up the excessive force they used against Plaintiff by lying to investigators, making false allegations in official NYPD reports, and otherwise fabricating evidence.

79.     NYPD policy and federal court orders mandate that all officers wear and activate body-worn cameras when interacting with persons suspected of criminal activity, using force, or

effectuating an arrest. P.G. 212-123(4).

80.     To cover up their unlawful actions, the Officer Defendants did not wear, or did not activate, their body-worn cameras at any point during their interaction with Plaintiff.

81.     To cover up their unlawful actions, the Officer Defendants falsely told other officers and investigators *that ramming Plaintiff with the police car was an accident.*

82.     This was a lie. Plaintiff did not accidentally contact the police car.

83.     The Officer Defendants' attempted narrative is squarely contradicted by the surveillance footage from 1212 East New York Avenue shown in Figures 1-4 above, which depicts Defendants Gevargiz and Buckhard intentionally ramming Plaintiff with their police car, running him over, and then reversing back over him.

84.     To cover up their unlawful actions, the Officer Defendants falsely told other officers and investigators *that they had merely tried to cut Plaintiff off*.

85.     This was a lie. The Officer Defendants did not try to cut Plaintiff off with their police car.

86.     The Officer Defendants' attempted narrative is squarely contradicted by the surveillance footage from 1212 East New York Avenue shown in Figures 1-4 above, which depicts Defendants Gevargiz and Buckhard intentionally ramming Plaintiff with their police car, running him over, and then reversing back over him.

87.     To cover up their unlawful actions, the Officer Defendants falsely told other officers and investigators *that Plaintiff ran in front of the police car*.

88.     This was a lie. Plaintiff did not run in front of the police car.

89.     The Officer Defendants' attempted narrative is squarely contradicted by the surveillance footage from 1212 East New York Avenue shown in Figures 1-4 above, which depicts Defendants Gevargiz and Buckhard intentionally ramming Plaintiff with their police car, running him over, and then reversing back over him.

90.     To cover up their unlawful actions, the Officer Defendants falsely told other officers

and investigators *that Plaintiff ran into the side of the police car*.

91.    This was a lie. Plaintiff did not run into the side of the police car.

92.    The Officer Defendants' attempted narrative is squarely contradicted by the surveillance footage from 1212 East New York Avenue shown in Figures 1-4 above, which depicts Defendants Gevargiz and Buckhard intentionally ramming Plaintiff with their police car, running him over, and then reversing back over him.

93.    To cover up the Officer Defendants' unlawful actions, Defendants made additional false statements about Plaintiff and their interactions with him.

94.    Defendants knew, or should have known, that their false statements and reports would be submitted to the Kings County District Attorney ("KCDA").

95.    Based on the false allegations described above, Defendants forwarded fabricated criminal charges against Plaintiff to the KCDA.

### *Defendant Chell Defames Plaintiff While Plaintiff Undergoes Surgery*

96.    Later on May 26, 2024—as Plaintiff fought for his life at Brookdale Hospital—Defendant Chell held an official NYPD press conference in Brooklyn.

97.    The press conference was attended by journalists and news agencies.

98.    The press conference was recorded and televised.

99.    During the press conference, Defendant Chell made multiple defamatory statements about Plaintiff in an apparent effort to sway public opinion against Plaintiff and justify and ratify the Officer Defendants' unlawful use of deadly force against him.

100.    During the press conference, Defendant Chell stated:

> "Brownsville section of Brooklyn, about 3:30 this morning. At Sutter Avenue and Ralph Avenue. Detectives from Bronx Narcotics who were assigned to a summer violence reduction zone observed a dispute in front of a store where a male displayed a firearm and pointed it at a female . . .
>
> These detectives were assigned in Brownsville, for gang violence, summer violence, they were exactly where they were supposed to be, probably prevented a shooting tonight.

101.    The false and defamatory statements in this speech include that Plaintiff "displayed" and "pointed" a firearm at a female, and that Plaintiff "probably" would have shot that female were it not for the Officer Defendants' actions.

102.    None of the Officer Defendants alleged that Plaintiff pointed a gun at a woman.

103.    No witness reported that Plaintiff pointed a gun at a woman or possessed the same.

104.    In fact, the very woman who was with Plaintiff when the officers unlawfully stopped and began to chase him told officers and anyone who would listen that "***they came and stopped him for nothing, for nothing, we were talking***" within minutes of the Officer Defendants ramming Plaintiff with their police car—far in advance of Defendant Chell's speech.

105.    The same woman also told journalists that she "***was never threatened with a firearm, and was simply talking to [Plaintiff] on the sidewalk***."[1]

106.    Defendants City and Chell published and disseminated a recording of the press conference.

107.    Defendant City owns, operates, and controls the "X" (a/k/a Twitter) account (or "handle") @NYPDnews, which is publicly available at https://x.com/NYPDnews.

108.    On May 26, 2024, Defendants City and Chell shared ownership, operation, and control of the X handle @NYPDChiefPatrol, which is publicly available at https://x.com/NYPDChiefPatrol.

109.    On May 26, 2024, Defendant City posted a recording of the press conference to the @NYPDnews account. Figure 5 is a true and accurate screenshot of this post.

---

[1] Glorioso, C., "New video contradicts NYPD account of police chase, collision: 'He ran right in front of the car'," NBC News (April 4, 2025), publicly available at:

https://www.nbcnewyork.com/investigations/new-video-contradicts-nypd-account-of-police-chase-collision-he-ran-right-in-front-of-the-car/6211691/.



*Figure 5*

110.    Defendant Chell reposted the same recording of the press conference to the @NYPDChiefPatrol account shortly after. Figure 6 is a true and accurate screenshot of this post.



*Figure 6*

111.    Defendants City and Chell knew that posting to their X handles would result in the dissemination of Defendant Chell's false and defamatory narrative to hundreds of thousands of people.

112.    As of this filing, the @NYPDnews account has over 828,000 "followers"—other X users who subscribe to receive news from the account.

113.    As of this filing, the @NYPDChiefPatrol account has over 47,000 followers.

114.    A recording of the May 26, 2024 press conference remains available on both the @NYPDnews and @NYPDChiefPatrol accounts. As of this filing, the recording has been viewed nearly 150,000 times.

115.    Journalists and news agencies quickly picked up on Defendant Chell's false and defamatory narrative and repeated it.

116.    For instance, on May 26, 2024, Defendant Chell's defamatory statements were repeated in a *Daily News* article titled *NYPD cops chasing gun-toting man hit him with vehicle, critically injuring him*. As recounted in the *Daily News* article, "*Two NYPD detectives came upon a man pointing this gun at a woman* outside a store at the corner of Sutter and Ralph Aves., NYPD Chief of Patrol *John Chell said* Sunday […] '*They probably prevented a shooting tonight*,' he said." (Emphases added.)

117.    Similarly, on May 28, 2024, Defendant Chell's defamatory statements were repeated in another *Daily News* article titled *Cops charge Brooklyn gunman critically injured colliding with NYPD car*. As recounted in the *Daily News* article, "*Giovonnie Mayo, 29, is charged with gun possession for allegedly pulling the weapon on a woman* outside a store near Sutter and Ralph Aves. in Brownsville about 3:25 a.m. Sunday, sparking the police pursuit." (Emphasis added.)

118.    Likewise, on May 28, 2024, Defendant Chell's defamatory statements were repeated in a *Citizen* article titled *Armed Man Hit by Unmarked Police Car*. As recounted in the *Citizen* article, "On Sunday afternoon in Brownsville, detectives assigned to a summer violence reduction program *saw a man pointing a gun at a woman. They chased the suspect, identified as 29-year-old Giovanni Mayo*, to East New York Avenue and Ralph Avenue. During the foot chase, an unmarked police vehicle collided with Mayo in a storage facility driveway. He was taken to Brookdale Hospital for surgery. *NYPD Chief of Patrol John Chell stated the detectives likely*

*prevented a shooting*." (Emphases added.)

119.    Defendants City and Chell failed to correct these false and defamatory statements.

120.    Defendant Chell made these false statements about Plaintiff with actual malice and knowledge of their falsity or a reckless disregard of the same.

121.    As detailed below, Defendant City knew or should have known that Defendant Chell had a long history of making defamatory, inflammatory, unprofessional statements about victims of police violence, including during NYPD press conferences and from his @NYPDChiefPatrol account, long before May 26, 2024.

### *Defendants Unlawfully Confine and Surveil Plaintiff*

122.    After the Officer Defendants rammed Plaintiff with their police car and Defendant Chell defamed him, the Doe Officers unlawfully held Plaintiff in indefinite custody for over 44 days without due process and in unconstitutional conditions of confinement while refusing to arraign him or seek indictment.

123.    The Doe Supervisors unlawfully held, or ordered the Doe Officers to unlawfully hold, Plaintiff in indefinite custody for over 44 days without due process and in unconstitutional conditions of confinement while refusing to arraign him or seek indictment.

124.    During these 44 days, the Doe Defendants refused to arraign Plaintiff while maintaining that his condition made him "un-arraign-able."

125.    Although not expressly authorized by New York's Criminal Procedure Law, "bedside" or "hospital" arraignments are a routine part of New York criminal practice frequently employed when a suspect's condition is such that he cannot be physically brought to court.

126.    During the 44 days that the Doe Defendants refused to arraign Plaintiff, the Doe Defendants handcuffed and ankle-shackled Plaintiff to his Brookdale Hospital bed.

127.    Figure 7 is a true and accurate photograph depicting Plaintiff shackled to his hospital bed during these 44 days.



*Figure 7*

128.    During the 44 days that the Doe Defendants refused to arraign Plaintiff, the Doe Defendants put Plaintiff under constant guard and intimately surveilled him from inside his hospital room, purposefully intruding on Plaintiff's family's grieving and conversations with doctors.

129.    During these 44 days, Plaintiff was often hooked up to a ventilator.

130.    During these 44 days, Plaintiff could not ambulate or move from his bed without assistance.

131.    During these 44 days, Plaintiff could not speak or meaningfully communicate.

132.    During these 44 days, Plaintiff's face and skull were fractured in numerous places.

133.    During these 44 days, Plaintiff's right hand was severely injured.

134.    During these 44 days, Plaintiff underwent multiple surgeries.

135.    During these 44 days, the entire left side of Plaintiff's skull was missing.

136.    Figure 8 is a true and accurate photograph depicting the entire left side of Plaintiff's skull missing following brain surgery.

18



*Figure 8*

137.    During these 44 days, the Doe Defendants excessively tightened Plaintiff's handcuffs and refused Plaintiff's family members' requests to loosen them.

138.    Plaintiff still has injuries and scars from the 44 days that the Doe Defendants handcuffed and shackled him to his hospital bed.

139.    Figure 9 is a true and accurate photograph of Plaintiff's right wrist taken nearly a year after his confinement, which depicts scarring caused by the overtightened handcuffs applied by the Doe Defendants.



*Figure 9*

19

140.    At no point during these 44 days did Plaintiff ever pose a danger or flight risk that required he be constantly handcuffed, shackled, and intimately surveilled.

141.    The Doe Defendants did not handcuff, shackle, and intimately surveil Plaintiff for 44 days because he posed a danger or flight risk.

142.    The Doe Defendants handcuffed, shackled, and intimately surveilled Plaintiff for 44 days to punish him.

143.    The Doe Defendants handcuffed, shackled, and intimately surveilled Plaintiff for 44 days to keep up the fiction that Plaintiff was a dangerous criminal who got what he deserved.

144.    The Doe Defendants handcuffed, shackled, and intimately surveilled Plaintiff for 44 days to keep up the fiction that the Officer Defendants and Defendant Chell acted properly.

145.    The Doe Defendants handcuffed, shackled, and intimately surveilled Plaintiff for 44 days because he was disabled.

146.    The Doe Defendants handcuffed, shackled, and intimately surveilled Plaintiff for 44 days to keep up an eye on Plaintiff's prognosis and learn private and confidential health information.

147.    The Doe Officers reported private and confidential health information about Plaintiff's medical condition, prognosis, and ability to speak to their colleagues and superiors, including the Doe Supervisors.

148.    The Doe Defendants' handcuffing and shackling of Plaintiff for 44 days interfered with his medical care.

149.    Plaintiff's handcuffs caused and exacerbated severe swelling in at least one of his arms.

150.    Plaintiff's handcuffs and shackles prevented him from adjusting medical equipment attached to his body.

151.    Because Plaintiff could not speak and Plaintiff had severe injuries to his right hand, Plaintiff's handcuffs prevented him from pointing and otherwise communicating with medical

staff and his family, particularly when his left wrist was handcuffed.

152.    Plaintiff's shackles prevented him from moving his legs, which increased his risk of developing blood clots in his legs.

153.    Plaintiff developed a painful and life-threatening blood clot in his leg while in custody.

154.    The Doe Defendants' intimate surveillance of Plaintiff for 44 days interfered with his medical care.

155.    Plaintiff was forced to receive his medical care and all or nearly all medical consultations and information about his prognosis in front of the Doe Officers stationed inside his hospital room.

156.    Plaintiffs' family members were forced to communicate with medical staff on Plaintiff's behalf in front of the Doe Officers stationed inside his hospital room.

157.    Plaintiff was forced to endure medical treatment, catheterization, bathing, and other private medical and sanitary procedures in front of the Doe Officers stationed inside his hospital room.

158.    The Doe Defendants refused to allow Plaintiff's family to visit Plaintiff in his hospital room without first obtaining a "permission slip" at the 73rd Precinct, which is approximately a 30-minute walk from Brookdale Hospital.

159.    The Doe Defendants' insistence that Plaintiff's family members obtain a permission slip before visiting Plaintiff—and their hours-long delay in issuing those permission slips even after Plaintiff's family members visited the 73rd Precinct—handicapped Plaintiff's family members' ability to visit Plaintiff in the hospital, monitor Plaintiff's health, and communicate with medical staff on Plaintiff's behalf.

160.    The Doe Defendants also interfered with Plaintiff's medical care in other ways.

161.    For instance, the Doe Defendants refused to allow Plaintiff's family members to transfer him to Mount Sinai Hospital, where Plaintiff's family believed his medical needs would

be better met.

162.    The Doe Defendants also attempted to transfer, or to have Plaintiff transferred, from Brookdale Hospital—a private institution—to the Bellevue Hospital Prison Ward.

163.    Bellevue Hospital Prison Ward is run by Defendant City and where incarcerated individuals in the custody of the New York City Department of Correction are typically confined for medical treatment.

164.    The Doe Defendants began efforts to effect Plaintiff's transfer to Bellevue Prison Ward no later than July 3, 2024.

165.    The Doe Defendants did not attempt to transfer Plaintiff to Bellevue Prison Ward in service of any legitimate law enforcement interest or for any legitimate medical reason. Between the severity of Plaintiff's condition and Bellevue Prison Ward's longstanding reputation as a sub-optimal provider of medical care to incarcerated individuals, there was none.

166.    The Doe Defendants attempted to transfer Plaintiff to Bellevue Prison Ward to punish him; to continue his indefinite, unlawful custody without any due process; to exert more control Plaintiff's medical care; to prevent private doctors from evaluating Plaintiff; to maintain the fiction that Plaintiff was a dangerous criminal; and to otherwise cover up their wrongdoing and protect Defendant Chell and the Officer Defendants.

167.    The Doe Defendants attempted to transfer Plaintiff to Bellevue Prison Ward on the self-evident fiction that Plaintiff, who could not walk and had half his skull missing, was a flight risk.

168.    The Doe Defendants attempted to transfer Plaintiff to Bellevue Prison Ward despite knowing that Plaintiff had not been arraigned.

169.    The Doe Defendants attempted to transfer Plaintiff to Bellevue Prison Ward despite maintaining that Plaintiff was "un-arraign-able."

170.    The Doe Defendants attempted to transfer Plaintiff to Bellevue Prison Ward despite knowing that the KCDA abandoned Plaintiff's prosecution on July 9, 2024, after a

representative of the KCDA visited Plaintiff's hospital bed.

171.    Figure 10 is a true and accurate excerpt of a Brookdale Hospital doctor's note from Plaintiff's file dated July 10, 2024—the day *after* the KCDA abandoned Plaintiff's prosecution.


- Maintain aspiration precautions
- **Pending dispo to Bellevue, under police custody** (per police, Un-"arraign"-able due to speech and a flight risk, due to trephination).
- F/u SW/CM
- Speaking valve on trach as long as tolerated
- Pain control

*Figure 10*

### Plaintiff's Injuries Are Severe and Many Are Permanent

172.    Plaintiffs' injuries are severe and many are permanent.

173.    Plaintiff has undergone multiple surgeries to repair and partially correct the severe and permanent injuries caused by Defendants, as well as the sequalae of the same.

174.    To this day, Plaintiff suffers from extensive brain damage.

175.    To this day, Plaintiff suffers from aphasia, the inability to form speech.

176.    To this day, Plaintiff suffers from amnesia, the inability to recall events.

177.    To this day, Plaintiff is partially paralyzed and largely unable to use his right hand.

178.    To this day, Plaintiff is unable to independently care for himself.

### Defendant Chell Has a Long History of Making Defamatory, Inflammatory, and Unprofessional Statements About Victims of Police Violence

179.    Defendant Chell has a long history of making defamatory, inflammatory, and unprofessional statements on behalf of Defendant City and the NYPD.

180.    Defendant Chell has made many such statements on his @NYPDChiefPatrol account. He has stated that he believes these uses of his social media account are necessary to address criticism of the NYPD that he believes is unfair.

181.    On January 28, 2025, Defendant City, through its Department of Investigation, issued a report that focused in large part on Defendant Chell's repeated use of his official NYPD

social media account to make threatening and unprofessional statements ("DOI Report").[2]

182.    Defendant City's DOI Report is titled *DOI'S OFFICE OF THE INSPECTOR GENERAL FOR THE NYPD CONCLUDES THAT CERTAIN SOCIAL MEDIA POSTS BY SEVERAL NYPD EXECUTIVES WERE IRRESPONSIBLE AND UNPROFESSIONAL AND RECOMMENDS IMPROVEMENTS TO NYPD'S SOCIAL MEDIA USE POLICY.*

183.    Defendant City's DOI Report concluded:

> "NYPD's social media policies and practices do not fully comply with the Citywide [media] Policy and that NYPD did not provide sufficient oversight of posts made on executive accounts. This lack of compliance and, in particular, the absence of an internal approval process for executive account posts, contributed, in part, to NYPD's failure to ensure that the posts on its official executive accounts [like Defendant Chell's] were courteous, accurate, and fully in compliance with relevant laws and regulations."

184.    Defendant City's DOI Report also found, among other things, that:

> a.    "Certain X posts made by members of NYPD's executive staff on official City accounts were unprofessional and encouraged an unproductive public discourse. They violated Department policies related to being courteous and civil, and raise questions with respect to whether they may be deemed prohibited engagement in political activity by City employees, but DOI reaches no conclusion on this issue."

> b.    "NYPD executives with individual social media accounts operate their accounts without sufficient oversight and outside the supervision of the office of NYPD's Deputy Commissioner of Public Information."

> c.    "NYPD does not provide formal training to NYPD executives with individual social media accounts regarding appropriate content for posting and the public impact of social media communications."

185.    Defendant City's DOI Report examined many social media posts that Defendant Chell has made to his @NYPDChiefPatrol account.

186.    One such post concerns a New York State Criminal Court judge that Defendant Chell evidently believes is soft on crime. In Defendant City's telling:

> "On February 27, 2024, Chief Chell posted on X about a New York State Criminal Court judge's decision to not incarcerate a particular arrestee who

---

[2] Publicly available at:

https://www.nyc.gov/assets/doi/reports/pdf/2025/04SocialMediaRpt_Release_01.28.2025.pdf.

was arrested on felony charges. Chief Chell stated in the post that NYPD and the District Attorney did their jobs by arresting and charging the person, but 'the Honorable Judge Sweeting' failed to do her job by releasing 'a predator back into the community, who may be on your next train, or walking the streets of our city, looking for his next victim.' Here, Chief Chell accused an Acting New York Supreme Court Justice of failing to do her job, when in fact he simply disagreed with a decision she made in her professional capacity. He also suggested that she would be responsible for future acts of violence by a defendant she had released, an inflammatory and speculative allegation."

187.    Defendant City concluded this post was "unprofessional and inappropriate."

188.    Another post concerns a lawyer, Olayemi Olurin, who criticized Mayor Eric Adams' policing polices on X, tweeting that "Eric Adams not only revived police units that were disbanded in 2020 for their disproportionate abuse against Black and brown New Yorkers, he revived stop and frisk. Since he became mayor, 97% of all stops and searches have been on Black and Latino New Yorkers." In Defendant City's telling:

> "Chief Chell reposted the post using divisive and hostile language towards Ms. Olurin. He mocked her self-description as a 'movement lawyer' and claimed she epitomized everything that 'true' New Yorkers oppose. He described her as a "misinformed person" and suggested Community Boards and Block Associations disagree with her stance. He ended the post with 'Talk soon...' apparently promising additional, and likely hostile, interaction with her via social media."

189.    Defendant City concluded that this was "an inappropriate use of [Defendant Chell's] official account, and could be interpreted as an effort to intimidate [Ms. Olurin] for challenging the Mayor's approach to policing and public safety or to send a message to others who might share her views."

190.    Another post concerns City Council Member Tiffany Cabán's criticism of the NYPD's arrest of over 100 student protestors at Columbia University on April 30, 2024. In Defendant City's telling:

> "[Defendant Chell took to his social media account and] called [Ms. Cabán's] statement 'garbage,' and labeled the Council Member as 'a person who hates our city.' He then encouraged people that 'if you want change, seek the change you want by getting involved. Then you know what to do...' He also took the position that it was the protesters' conduct, their entitlement, and their support from Council Member Cabán that was a 'disgrace.'"

25

191.    Defendant City concluded that Defendant Chell's social media response was "insulting and arguably intimidating."

192.    Defendant City is correct: "No aspect of the social media exchanges discussed above served the public."

193.    The DOI Report also examined other instances where Defendant Chell used his social media to criticize journalists and news organizations. Those instances are too numerous to catalogue here and Plaintiff incorporates the DOI Report by reference.

194.    The City has condoned and ratified Defendant Chell's inflammatory and unprofessional uses of his social media account.

195.    Defendant Chell was promoted to Chief of Department in January 2025—the **same month** the DOI Report was released.

196.    Mayor Adams himself has defended Defendant Chell's use of his social media account, arguing "if a columnist has a right to an opinion, a police officer has the right to an opinion."[3]

197.    With Defendant City not only failing to address Defendant Chell's behavior but repeatedly promoting him, New Yorkers have taken matters into their own hands.

198.    For instance, in April 2024, Dana Rachlin, a police reform advocate, filed a lawsuit in which she brings claims for defamation and First Amendment retaliation against Defendant Chell and other NYPD officials. Her lawsuit, captioned *Rachlin v. The City of New York, et al.*, No. 24 Civ. 02626 (EDNY), remains ongoing.

199.    Ms. Rachlin's complaint alleges, among other things, that Defendant Chell and other NYPD officials defamed her in retaliation for engaging in protected speech critical of the NYPD; that Defendant Chell told community members that "Ms. Rachlin had fabricated a rape accusation";

---

[3] Donaldson, S., "Adams defends NYPD's 'right to have an opinion,'" CITY & STATE NEW YORK (April 2, 2024), publicly available at:

https://www.cityandstateny.com/politics/2024/04/adams-defends-nypds-right-have-opinion/395415.

and that Defendant Chell told other police officers that Ms. Rachlin "should know we can humiliate her at any time" and ordered a subordinate to communicate this threat to Ms. Rachlin, which the subordinate did.

200.    Similarly, in August 2024, Kimberly Bernard, another police reform advocate, filed a lawsuit in which she brings claims for First Amendment retaliation against Defendant Chell and other NYPD officials. Her lawsuit, captioned *Bernard v. City of New York, et al.*, No. 24 Civ. 6049 (SDNY), remains ongoing.

201.    Ms. Bernard's complaint alleges, among other things, that she was falsely arrested during a candlelight vigil in May 2024 calling for accountability following the public killing of Jordan Neely; that Defendant Chell "levied fabricated allegations that Ms. Bernard . . . possessed a 'Molotov cocktail'" during the vigil; and that the NYPD shared her home address in a public press release.

202.    During that same vigil, Stephanie Keith, a photojournalist, was arrested after Defendant Chell repeatedly shouted "Lock her up!" A related report by the Civilian Complaint Review Board ("CCRB") reflects that the criminal charges against Ms. Keith have since been dismissed and that Ms. Keith has filed a Notice of Claim noticing her intent to sue for defamation.

### *The Officer Defendants and Defendant Chell Have Long Histories of Civil Rights Violations*

203.    Defendant City knew or should have known that Defendant Chell and the Officer Defendants were unfit to be uniformed law enforcement officers long before May 26, 2024.

204.    Defendant Chell has been sued for civil rights violations many times.

205.    Defendant Chell's NYPD Central Personnel Index reflects a litany of serious misconduct and a complete absence of meaningful discipline for the same.

206.    The Officer Defendants have collectively been sued for civil rights violations in no

fewer that **29 separate civil lawsuits**.[4]

207. Those 29 lawsuits have cost New York City taxpayers over $ 2.7 million and counting in settlements alone. Excessive force and racial profiling are frequent themes.

208. The Officer Defendants have collectively amassed over **50 civilian allegations** before the CCRB, with Black and Latinx New Yorkers repeatedly accusing the officers of calling them racial epithets and slamming their heads into walls and doors.

### Defendant Gevargiz

209. Defendant Gevargiz has been employed by the NYPD since 2007.

210. Defendant Gevargiz has been sued at least twelve times in connection with his work as an NYPD officer. Specifically, Defendant Gevargiz has been named as a defendant in:

    a. *Stewart v. City of New York, et al.*, Index No. 027837/2018E (BCSC);
    b. *Adams v. Gevargiz, et al.*, Index No. 21472/2019E (BCSC);
    c. *Echevarria v. City of New York, et al.*, Index No. 027150/2019E (BCSC);
    d. *Dennis v. City of New York, et al.*, Index No. 033292/2019E (BCSC);
    e. *Martinez v. City of New York, et al.*, Index No. 031422/2020E (BCSC);
    f. *Goodridge v. City of New York, et al.*, Index No 814567/2021E (BCSC);
    g. *Molina v. City of New York, et al.*, Index No. 815417/2022E (BCSC);
    h. *Ford v. City of New York, et al.*, Index No. 811459/2023E (BCSC);
    i. *Garwood v. City of New York, et al.*, Index No. 820687/2023E (BCSC);
    j. *Reyes v. City of New York, et al.*, Index No. 350013/2015 (BCSC);
    k. *Garcia v. City of New York, et al.*, Index No. 302187/2015 (BCSC); and
    l. *Montalvo v. City of New York, et al.*, Index No. 303896/2015 (BCSC).

211. These twelve lawsuits have collectively cost New York City taxpayers at least $270,000 and counting in settlements alone.[5]

212. In *Stewart*, the plaintiff alleged that Defendant Gevargiz and his fellow officers falsely arrested him, among other things. Defendant City settled the case for $25,000 in 2016. Defendant Gevargiz was not terminated.

213. In *Adams*, the plaintiffs alleged that Defendant Gevargiz and his fellow officers

---

[4] This tally does not include any lawsuits in which the Officer Defendants were named as "Doe" defendants and the caption of the lawsuit was not amended prior to settlement.

[5] *See generally* Leva Gevargiz, Officer Profile, 50-a.org, publicly available at:
https://www.50-a.org/officer/4X8T.

falsely arrested them, among other things. Defendant City settled the case for $45,000 in 2020. Defendant Gevargiz was not terminated.

214. In *Echevarria*, the plaintiff alleged that Defendant Gevargiz and his fellow officers falsely arrested him, among other things. The case remains pending.

215. In *Dennis*, the plaintiff alleged that Defendant Gevargiz and his fellow officers falsely arrested him, among other things. Defendant City settled the case for $25,000 in 2022. Defendant Gevargiz was not terminated.

216. In *Martinez*, the plaintiff alleged that Defendant Gevargiz and his fellow officers used excessive force and falsely arrested and racially profiled him, among other things. Defendant City settled the case for $20,000 in 2023. Defendant Gevargiz was not terminated.

217. In *Goodridge*, the plaintiff alleged that Defendant Gevargiz and his fellow officers used excessive force and falsely arrested and racially profiled him, among other things. Defendant City settled the case for $17,500 in 2024. Defendant Gevargiz was not terminated.

218. In *Molina*, the plaintiff alleged that Defendant Gevargiz and his fellow officers used excessive force and falsely arrested him, among other things. The case remains pending.

219. In *Ford*, the plaintiff alleged that Defendant Gevargiz and his fellow officers used excessive force and falsely arrested him, among other things. Defendant City settled the case for $45,000 in 2024. Defendant Gevargiz was not terminated.

220. In *Garwood*, the plaintiff alleged that Defendant Gevargiz and his fellow officers used excessive force and falsely arrested him, among other things. Defendant City settled the case for $40,000 in 2025. Defendant Gevargiz was not terminated.

221. In *Reyes*, Defendant Gevargiz was named as a defendant in connection with his police work. Defendant City settled the case for $15,000 in 2019. Defendant Gevargiz was not terminated.

222. In *Garcia*, Defendant Gevargiz was named as a defendant in connection with his police work. Defendant City settled the case for $37,500 in 2016. Defendant Gevargiz was not

terminated.

223.    In *Montalvo*, Defendant Gevargiz was named as a defendant in connection with his police work. Defendant City settled the case for $25,000 in 2016. Defendant Gevargiz was not terminated.

224.    Through these and other incidents, Defendant City knew or should have known that Defendant Gevargiz was unfit for law enforcement work.

225.    However, Defendant City failed, and continues to fail, to take appropriate action in response to Defendant Gevargiz's long history of civil rights violations and serious misconduct.

### **Defendant Burckhard**

226.    Defendant Burckhard has been employed by the NYPD since 2006.

227.    Defendant Burckhard has been sued at least eight times in connection with his work as an NYPD officer. Specifically, Defendant Burckhard has been named as a defendant in:

  a.  *Balde v. City of New York, et al.*, Index No. 307488/2011 (BCSC);
  b.  *Perez v. City of New York, et al.*, Index No. 150770/2014 (NYCSC);
  c.  *Deloach v. City of New York, et al.*, Index No. 302080/2016 (BCSC);
  d.  *Townes v. City of New York, et al.*, Index. No. 16 Civ. 08543 (SDNY);
  e.  *Washington v. City of New York, et al.*, Index No. 26021/2018E (BCSC);
  f.  *Olavarria v. City of New York, et al.*, Index No. 27600/2018E (BCSC);
  g.  *Gadsden v. City of New York, et al.*, Index No. 34166/2018E (BCSC); and
  h.  *Ufret v. City of New York, et al.*, Index No. 22723/2020E (BCSC).

228.    These eight lawsuits have collectively cost New York City taxpayers at least $1,089,000 and counting in settlements alone.[6]

229.    In *Balde*, the plaintiff, a 20-year-old Black male, alleged that Defendant Burckhard shot him nine times. Defendant Burkhard and his fellow officers claimed that the plaintiff was armed in an attempt to justify their use of deadly force, while the plaintiff—who somehow lived—claimed he was unarmed and that Defendant Burkhard shot him in the back while he lay on the ground.

230.    The jury sided with the plaintiff. Specifically, the jury ***found Defendant***

---

[6] *See generally* Joseph Burckhard, Officer Profile, 50-a.org, publicly available at: https://www.50-a.org/officer/7B4X.

***Burckhard and his fellow officers liable for excessive force and entered a punitive damages award against Defendant Burckhard.***

231.    Figure 11 is a true and accurate excerpt of the jury's verdict sheet in the *Balde* case.



*Figure 11*

232.    Following trial, Defendant City settled the case for $850,000. Defendant Burckhard was not terminated.

233.    In *Perez*, the plaintiff alleged that Defendant Burckhard and his fellow officers used excessive force and falsely arrested him, among other things. Defendant City settled the case for $75,000 in 2016. Defendant Burckhard was not terminated.

234.    In *Deloach,* Defendant Burckhard was named as a defendant in connection with his police work. Defendant City settled the case for $75,000 in 2017. Defendant Burckhard was not terminated.

235.    In *Townes*, the plaintiff alleged that Defendant Burckhard and his fellow officers falsely arrested her, among other things. Defendant City settled the case for approximately $42,000 in 2017. Defendant Burckhard was not terminated.

236.    In *Washington*, the plaintiff alleged that Defendant Burkhard and his fellow officers used excessive force and falsely arrested him, among other things. Defendant City settled the case for approximately $32,000 in 2019. Defendant Burckhard was not terminated.

237.    In *Olavarria*, the plaintiff alleged that Defendant Burkhard and his fellow officers falsely arrested her, among other things. Defendant City settled the case for $15,000 in 2019. Defendant Burckhard was not terminated.

238.    In *Gadsen*, the plaintiffs alleged that Defendant Burckhard and his fellow officers unlawfully entered an apartment, strip-searched them without cause, and falsely arrested them, among other things. The case remains pending.

239.    In *Ufret*, the plaintiff alleged that Defendant Burckhard and his fellow officers falsely arrested him, among other things. The case remains pending.

240.    During his time at the NYPD, Defendant Burckhard has also been the subject of at least fourteen civilian allegations before the CCRB.

241.    Through these and other incidents, Defendant City knew or should have known that Defendant Burckhard was unfit for law enforcement work.

242.    However, Defendant City failed, and continues to fail, to take appropriate action in response to Defendant Burckhard's long history of civil rights violations and serious misconduct.

### Defendant Memedoski

243.    Defendant Memedoski has been employed by the NYPD since 2006.

244.    Defendant Memedoski has been sued at least five times in connection with his work as an NYPD officer. Specifically, Defendant Memedoski has been named as a defendant in:

    a.  *Bennett v. City of New York, et al.*, Index No. 027425/2017 (BCSC);
    b.  *Gurley v. City of New York, et al.*, Index No. 027426/2017 (BCSC);
    c.  *Arias v. City of New York, et al.*, Index No. 033762/2019E (BCSC);
    d.  *Read v. City of New York, et al.*, Index No. 817669/2024E (BCSC); and
    e.  *Vargas v. City of New York, et al.*, Index No. 820075/2024E (BCSC).

245.    These five lawsuits have collectively cost New York City taxpayers at least $60,000 and counting in settlements alone.[7]

---

[7] *See generally* Ferdi Memedoski, Officer Profile, 50-a.org, publicly available at: https://www.50-a.org/officer/4T5K.

246.     In *Bennett*, the plaintiff alleged that Defendant Memedoski and his fellow officers used excessive force and falsely arrested her, among other things. Defendant City settled the case for $15,000 in 2021. Defendant Memedoski was not terminated.

247.     In *Gurley*, the plaintiff alleged that Defendant Memedoski and his fellow officers falsely arrested her, among other things. Defendant City settled the case for $25,000 in 2021. Defendant Memedoski was not terminated.

248.     In *Arias*, the plaintiff alleged that Defendant Memedoski and his fellow officers, including Defendant Markvukaj, falsely arrested her, among other things. Defendant City settled the case for either $9,000 or $20,000 in 2024. Defendant Memedoski was not terminated.

249.     In *Read*, the plaintiff alleged that Defendant Memedoski and his fellow officers used excessive force and falsely arrested him, among other things. The case remains pending.

250.     In *Vargas*, the plaintiff alleged that Defendant Memedoski and his fellow officers used excessive force and falsely arrested him, among other things. The case remains pending.

251.     During his time at the NYPD, Defendant Memedoski has also been the subject of at least ten civilian allegations before the CCRB.

252.     As a result of some of these allegations, in 2010 Defendant Memedoski received command disciplines for performing stops and searches without just cause.

253.     But many other civilian allegations against Defendant Memedoski have not been addressed by the NYPD.

254.     For instance, in a 2016 complaint, a Black civilian told the CCRB that Defendant Memedoski "***stepped on his head***" and "***punched, kicked, and stomped on his head and back***" while he was on the ground. Defendant Memedoski was not disciplined for this alleged behavior after he denied doing it.

255.     On May 12, 2022—two years before the incident at issue here—Defendant Memedoski and his partner shot and killed Billy Lee in the Bronx after apparently mistaking an air pistol for a real firearm.

256.    Neither Defendant Memedoski nor his partner had a body-worn camera activated at the time, and the Office of the New York State Attorney General ("OAG") "conclude[ed] a prosecutor would not be able to disprove beyond a reasonable doubt that the officers' use of deadly force against Mr. Lee was justified" and did not seek charges.[8]

257.    In May 2019, the NYPD investigated Defendant Memedoski for "invoice discrepancy" related to a controlled substance he had vouchered and substantiated allegations after finding he "miscount[ed]" narcotics.

258.    In February 2023, the NYPD investigated Defendant Memedoski after an arrestee accused Defendant Memedoski of stealing $2,000 that he had vouchered. The NYPD closed the investigation after concluding that "there is insufficient evidence to prove or disprove that Det. Memedoski removed the US currency."

259.    In October 2024, the NYPD again Defendant Memedoski for "invoice discrepancy" related to a controlled substance he had vouchered. It is unclear whether this investigation has concluded.

260.    Through these and other incidents, Defendant City knew or should have known that Defendant Memedoski was unfit for law enforcement work.

261.    However, Defendant City failed, and continues to fail, to take appropriate action in response to Defendant Memedoski's long history of civil rights violations and serious misconduct.

**Defendant Markvukaj**

262.    Defendant Markvukaj has been employed by the NYPD since 2014.

263.    Defendant Markvukaj has been sued at least five times in connection with his work as an NYPD officer. Specifically, Defendant Markvukaj has been named as a defendant in:

    a.    *Sanchez v. City of New York, et al.*, Index No. 034300/2018E (BCSC);
    b.    *Pagan-Alomar v. City of New York, et al.*, Index No. 020068/2019E (BCSC);
    c.    *Arias v. City of New York, et al.*, Index No. 807619/2022E (BCSC);

---

[8] New York State Attorney General Office of Special Investigation, "Report on the Investigation into the Death of Billy Lee" (Aug. 9, 2024), publicly available at:

https://ag.ny.gov/sites/default/files/reports/2024.8.2-billy-lee-report.pdf.

     d.   *Grandy v. City of New York, et al.*, Index No. 804550/2024E (BCSC); and

     e.   *Rogers v. City of New York, et al.*, Index No. 813211/2024E (BCSC).

264.    These five lawsuits have collectively cost New York City taxpayers at least $1,324,000 and counting in settlements alone.[9]

265.    In *Sanchez*, the plaintiff alleged that Defendant Markvukaj and his fellow officers used excessive force and falsely arrested and racially profiled him, among other things. Defendant City settled the case for $25,000 in 2020. Defendant Markvukaj was not terminated.

266.    In *Pagan-Alomar*, the plaintiff alleged that Defendant Markvukaj and his fellow officers used excessive force ***sufficient to knock her left eye out of its socket*** and falsely arrested and racially profiled her, among other things. Defendant City settled the case for $1,250,000 in 2020. Defendant Markvukaj was not terminated.

267.    In *Arias*, the plaintiff alleged that Defendant Markvukaj and his fellow officers, including Defendant Memedoski, falsely arrested her, among other things. Defendant City settled the case for either $9,000 or $20,000 in 2024. Defendant Markvukaj was not terminated.

268.    In *Grandy*, the plaintiff alleged that Defendant Markvukaj and his fellow officers used excessive force and falsely arrested her, among other things. The case remains pending.

269.    In *Rogers*, the plaintiff alleged that Defendant Markvukaj and his fellow officers used excessive force and falsely arrested him, among other things. Defendant City settled the case for $40,000 in 2024. Defendant Markvukaj was not terminated.

270.    During his time at the NYPD, Defendant Markvukaj has also been the subject of at least 30 civilian allegations before the CCRB.

271.    As a result of some of these allegations, in 2016 and 2018 Defendant Markvukaj received command disciplines for performing searches without just cause and conducting unlawful body cavity and strip searches.

---

[9] *See generally* Konti Markvukaj, Officer Profile, 50-a.org, publicly available at: https://www.50-a.org/officer/DVKM.

272.     But many other civilian allegations against Defendant Markvukaj have not been addressed by the NYPD.

273.     For instance, in a 2016 complaint, a Black civilian told the CCRB that Defendant Markvukaj "grabbed his head and slammed it into a wall" while either Defendant Markvukaj or his fellow officers called him a "***n\*\*\*\*r***". Defendant Markvukaj was not disciplined for this alleged behavior after he denied doing it.

274.     Likewise, in another 2016 complaint, a Latinx civilian told the CCRB that Defendant Markvukaj "***slammed his face into a door***" and called him a "***slimeball, a piece of s\*\*t, good for nothing immigrant***." Defendant Markvukaj was not disciplined for this alleged behavior after he denied doing it.

275.     Through these and other incidents, Defendant City knew or should have known that Defendant Markvukaj was unfit for law enforcement work.

276.     However, Defendant City failed, and continues to fail, to take appropriate action in response to Defendant Markvukaj's long history of civil rights violations and serious misconduct.

## Defendant Chell

277.     Defendant Chell has been employed by the NYPD since 1994.

278.     Defendant Chell has been sued in connection with his work as an NYPD officer and official many times.[10]

279.     In addition to using his position of authority within the NYPD to criticize victims of police violence, Defendant Chell has a long history of other serious misconduct.

280.     For instance, on August 7, 2008, Defendant Chell shot and killed Ortanzso Bovell, a 25-year-old Black man.[11]

---

[10] *See generally* John Chell, Officer Profile, 50-a.org, publicly available at: https://www.50-a.org/officer/9MP7.

[11] *See* Grench, E., "NYPD 'Accidental' Killer Cop's Rise to Brooklyn Chief Questioned," THE CITY (April 15, 2021), publicly available at: https://www.thecity.nyc/2021/04/15/nypd-accidental-killers-rise-to-brooklyn-chief-questioned.

281.    In the related civil case, *Bovell v. City of New York, et al.*, Index No. 25659/2009 (KCSP), Defendant Chell testified that he accidentally discharged his weapon into Mr. Bovell's back.

282.    The jury in that case **found Defendant Chell guilty of excessive force for shooting Mr. Bovell**.

283.    In reaching this conclusion, the jury necessarily rejected Defendant Chell's sworn testimony to the effect that he had accidently discharged his firearm into Mr. Bovell's back and found that Defendant Chell acted intentionally, as seen in the verdict sheet.

284.    Figure 12 is a true and accurate excerpt of the jury's verdict sheet in the *Bovell* case.



*Figure 12*

285.    Defendants City and Chell were ordered to pay $1.5 million dollars to Mr. Bovell's family.

286.    Defendant Chell's Central Personnel Index reflects that he was not formally disciplined in connection with the shooting of Mr. Bovell.

287.    Figure 13 is a true and accurate excerpt of Defendant Chell's Central Personnel Index relating to the shooting of Mr. Bovell. The red circle has been added by Plaintiff's counsel.



*Figure 13*

288.    In fact, in 2009, Defendant Chell was cleared for promotion despite the fact that the shooting of Mr. Bovell was his third documented firearms discharge.

289.    In another example of misconduct, Defendant Chell's Comprehensive Officer History reflects that, in 2012, the Internal Revenue Service investigated Defendant Chell "for obtaining stolen identities and then reporting supplemental income to that identity for tax purposes" in violation of 26 U.S.C. § 7201.

290.    Figure 14 is a true and accurate excerpt of Defendant Chell's Comprehensive Officer History relating to this investigation.



*Figure 14*

291.    The following year, Defendant Chell pled guilty in an NYPD investigation to "attempt[ing] to evade" the payment of "federal tax" from 1997 through 2003.

292.    Figure 15 is a true and accurate excerpt of Defendant Chell's Central Personnel Index relating to this misconduct, reelecting that the only discipline he received for this serious misconduct the loss of ten vacation days. The red circle has been added by Plaintiff's counsel.



*Figure 15*

293.    Defendant Chell's Comprehensive Officer History and Central Personnel Index reflect a litany of other accusations of serious misconduct and very few instances of discipline.

294.    For example, in November 2012, Defendant Chell was investigated for "Bribe Receiving and Official Misconduct" and violations of departmental policy related to his acts at a Sunoco gas station in the aftermath of Hurricane Sandy.  A witness reported not only that Defendant Chell took charge of the gas station and directed NYPD officers to cut the long line of civilians waiting to buy gas, but also that he also was observed taking a potential bribe from a motorist that he allowed to cut the line. No discipline was imposed.

295.    Many of the accusations against Defendant Chell were made by fellow NYPD officers, despite the informal code of silence among police offices often referred to as the "blue wall of silence."

296.    For example, in June 2005, Defendant Chell was investigated for violations of departmental policy after a fellow officer accused Defendant Chell of "has someone sign him in [for his shift] and go[ing] out for the night drinking" while mak[ing] OT [overtime] without being present." The following year Defendant Chell pled guilty in an NYPD investigation to "being absent from [his assignment] without permission or police necessity."

297.    Through these and other incidents, Defendant City knew or should have known that Defendant Chell was unfit for law enforcement work.

298.    However, Defendant City failed, and continues to fail, to take appropriate action in response to Defendant Chell's long history of civil rights violations and serious misconduct.

299.    Defendant Chell was promoted to NYPD Chief of Department in January 2025, the highest uniformed rank in the NYPD.

### *The NYPD Has a Policy of Unlawfully Weaponizing Police Vehicles and Failing to Train Officers on Appropriate Uses of Police Vehicles*

300.    It was no accident that the Officer Defendants pursued and rammed Plaintiff with their police car on May 26, 2024. It was the predictable and inevitable consequence of a policy choice.

301.    As of May 26, 2024, Defendant City had an unconstitutional policy, custom, or usage of unlawfully weaponizing police vehicles and using them in inappropriate chases.

302.    This policy, custom, or usage was characterized by, among other things:

    a.   ordering and encouraging NYPD officers to unlawfully weaponize their police vehicles and use them in inappropriate chases;

    b.   failing to discipline NYPD officers who unlawfully weaponized their police vehicles or used them in inappropriate chases;

    c.   disciplining and criticizing NYPD officers who refused to unlawfully weaponize their police vehicles or use them in inappropriate chases;

    d.  failing to train NYPD officers on the circumstances in which it is unlawful or inappropriate to weaponize police vehicles or use them in a chase;

    e.  vesting NYPD officers with too much discretion in deciding when to weaponize their police vehicles or use them in chases;

    f.  failing to investigate circumstances in which NYPD officers unlawfully weaponized their police vehicles or used them in inappropriate chases;

    g.  assisting NYPD officers who unlawfully weaponized their police vehicles or used them in inappropriate chases in covering up wrongdoing; and

    h.  rewarding NYPD officers who weaponized their police vehicles and used them in inappropriate chases (collectively, "**Vehicle Policies**").

303.    The constitutional violations caused by the Vehicle Policies were widespread, persistent, and ongoing as of May 26, 2024.

304.    Defendants City and Chell knew that their Vehicle Policies had resulted in constitutional violations before May 26, 2024, not least because officers were more likely to escape departmental investigation and discipline when using their vehicles and not firearms to inflict deadly force.

305.    Defendants City and Chell knew to a moral certainty that their Vehicle Policies would continue to result in constitutional violations before May 26, 2024.

306.    Despite knowing that their Vehicle Policies had resulted in constitutional violations before May 26, 2024 and would obviously continue to do so, Defendants City and Chell failed to change their Vehicle Policies or take appropriate action to prevent or sanction the violations of constitutional rights caused by their Vehicle Policies.

307.    Instead, Defendants City and Chell ignored, tolerated, and ratified the constitutional violations caused by their Vehicle Policies; made no meaningful attempt to prevent future violations; and consciously adopted a policy of inaction in face of them.

308.    Defendants City and Chell were deliberately indifferent to the constitutional rights of New Yorkers, like Plaintiff, who were adversely impacted by their Vehicle Policies.

309.    The Vehicle Policies were the moving force behind Plaintiff's injuries.

*December 2022: Defendant Chell is Promoted to Chief of Patrol and Immediately Orders Officers to Engage in More Frequent and More Dangerous Vehicle Chases*

310.    In December 2022, Defendant Chell was promoted to Chief of Patrol and immediately changed NYPD policies to encourage officers to engage in more frequent and more dangerous vehicle chases.

311. Defendants Chell implemented these policy changes without any additional training or supervision for NYPD officers, many of whom had not received any or appropriate vehicle pursuit training.

312.    Defendant Chell justified these policy changes on grounds that they were necessary to crack down on "quality of life" related matters and be tough on crime. As he later put it, "With the enforcement of more moving summonses and car stops, and people thinking they can take off on us . . . those days are over,"[12] and "the days of driving around this city lawless, doing what you think you're gonna do, it's over."[13]

313.    Defendant Chell made these policy changes without officially amending NYPD's formal policies and guidelines.[14]

*January-June 2023: NYPD Vehicle Pursuits and Related Injuries Immediately Skyrocket While the NYPD Ignores the OAG*

---

[12] Brosnan, E., "NYPD chief attributes more car chases to rise in 'ghost vehicles,'" SPECTRUM NEWS (July 10, 2023), publicly available at:

https://ny1.com/nyc/all-boroughs/mornings-on-1/2023/07/10/nypd-chief-attributes-more-car-chases-to-rise-in--ghost-vehicles-.

[13] Gonen, Y. & Bhat, S., "More NYPD Vehicle Pursuits in Last Six Months Than Prior Five Years Combined," THE CITY (July 21, 2023), publicly available at:

https://www.thecity.nyc/2023/07/21/nypd-car-chase-increase-chell/.

[14] *See* Gonen, Y. & Bhat, S., "More NYPD Vehicle Pursuits in Last Six Months Than Prior Five Years Combined," THE CITY (July 21, 2023) ("The surge comes without any change to the NYPD patrol guide procedure that dictates the limited circumstances where vehicle pursuits are allowed."), publicly available at:

https://www.thecity.nyc/2023/07/21/nypd-car-chase-increase-chell/.

*See also* Gonen, Y., Bhat, S., & Siegel, H., "NYPD Car Chases Up Massively Under Mayor Adams — With Sometimes Fatal Results," (December 16, 2024) ("Th[e] shift, however, has "happened without any change to the NYPD's formal policies and guidelines that emphasize pursuits in the city should be a last resort."), publicly available at:

https://www.thecity.nyc/2023/07/05/nypd-car-chases-eric-adams-quality-life-community/.

314.    Whatever the precise nature of Defendant Chell's policy changes, those changes were a clear signal to all NYPD officers—including the Officer Defendants—that they could and should use their NYPD vehicles as weapons and in dangerous chases.

315.    The effect of Defendant Chell's policy changes was dramatic and immediate.

316.    Three months into 2023, NYPD officers had engaged in more vehicle pursuits than in all of 2022.

317.    Six months into 2023, NYPD officers had engaged in more vehicle pursuits than in the previous five years combined.

318.    Figure 16 is a true and accurate graph depicting these and other statistics, drawn from a December 16, 2024 article by Yoav Gonen, Suhail Bhat, and Harry Siegel for *The City* titled *NYPD Car Chases Up Massively Under Mayor Adams — With Sometimes Fatal Results.* [15]



**NYPD Hits the Gas on Car Chases**
Number of vehicle pursuits recorded in NYPD's 911 system from Jan. 1, 2018 to June 30, 2023

Chart: Suhail Bhat / THE CITY · Source: NYPD Calls for Service    THE CITY

---

[15]    Publicly available at: https://www.thecity.nyc/2023/07/05/nypd-car-chases-eric-adams-quality-life-community/.

*Figure 16*

319.    On January 19, 2023, the OAG published a report titled *Report on the Investigation into the Death of Delroy Morris*.[16]

320.    In July 2020, 37-year-old Mr. Morris was struck and killed by two NYPD officers who "drove through a steady red light" responding to a 911 call.

321.    Neither officer had a body-worn camera activated at the time, and the OAG concluded a prosecutor "would not be able to prove beyond a reasonable doubt that PO Martino [the driver] committed the crime of criminally negligent homicide" and did not seek charges.

322.    The OAG recommended in its report that the NYPD ensure all officers receive regular vehicle operation training.

323.    The OAG noted in its report that NYPD officers undergo twice-yearly firearms training despite the statistical improbability that officers will discharge their firearms but undergo no regular vehicle training despite their daily use of NYPD vehicles.

324.    The NYPD did not make the OAG's recommended change.

*July-August 2023: NYPD Officials Express Concern About Defendant Chell's Policy Changes and At Least One Official Gets Ousted For Doing So*

325.    In Summer 2023, some NYPD officials expressed concern about the dangers posed by Defendant Chell's policy changes.

326.    Anonymous NYPD officials criticized Defendant Chell's policy changes and noted that the changes were made without adequate planning, study, or oversight.

327.    One anonymous NYPD official told journalists that "the emphasis on pursuits, with the encouragement of top police brass" under Defendant Chell's policy changes, "creates a hopped-up environment that can become a 'free for all.'"[17]

---

[16] Publicly available at:  https://ag.ny.gov/sites/default/files/reports/morris_report_osi.pdf.

[17] Gonen, Y. & Bhat, S. "More NYPD Vehicle Pursuits in Last Six Months Than Prior Five Years Combined," THE CITY (July 21, 2023), publicly available at:

328.    Two anonymous NYPD officials told journalists that "quality-of-life team[s] . . . serv[ing] under Chief of Patrol John Chell. . . have been conducting a high number of vehicle stops and engaging in relatively aggressive policing, but with [even] less vetting and training" than prior controversial teams that the NYPD had disbanded.[18]

329.    These officials remained anonymous for good reason.

330.    In August 2024, Matthew Pontillo, the Chief of the NYPD's Risk Management Bureau—the unit tasked with identifying and preventing police misconduct—was ousted by the newly appointed NYPD Commissioner Edward Caban.

331.    Chief Pontillo, who had headed the Risk Management Bureau since 2021, had been critical of Defendants Chell's policy changes, "going so far as to flag 20 officers involved in such pursuits for additional training or supervision."[19]

332.    "Those actions put him at odds with other high-ranking officers and paved the way to his forced resignation."[20]

333.    Around this same time, Defendant Chell told journalists "We [the NYPD] think we're headed in the right direction for everything we're doing" in reference to his policy changes.[21]

334.    Around this same time, Defendant City effectively hid the NYPD's vehicle pursuit policy, which had previously been available online, from the public.

---

https://www.thecity.nyc/2023/07/21/nypd-car-chase-increase-chell/.

[18] Gonen, Y., Honan, K., & Siegel, H., "NYPD Chief Who Criticized Surge In Vehicle Pursuits Ousted," THE CITY (August 22, 2023), publicly available at:

https://www.thecity.nyc/2023/08/22/nypd-risk-pontillo-resign-car-chase/.

*See also* Watkins, S., "N.Y.P.D. Disbands Plainclothes Units Involved in Many Shootings," NEW YORK TIMES (June 12, 2020), publicly available at:

https://www.nytimes.com/2020/06/15/nyregion/nypd-plainclothes-cops.html.

[19] *Id.*

[20] *Id.*

[21] Brosnan, E., "NYPD chief attributes more car chases to rise in 'ghost vehicles'," SPECTRUM NEWS NY1 (July 10, 2023), publicly available at:

https://ny1.com/nyc/all-boroughs/mornings-on-1/2023/07/10/nypd-chief-attributes-more-car-chases-to-rise-in--ghost-vehicles-.

335.    Since Local Law 129 of 2016 passed, NYPD has published much of its Patrol Guide online.

336.    The NYPD has always omitted P.G. 221-15, the section of the patrol guide instructing officers with respect to "vehicle pursuits," from this publication.

337.    However, beginning in 2016, the CCRB also published the NYPD Patrol Guide online, including the omitted P.G. 221-15 "vehicle pursuits" section.

338.    The CCRB removed its publication of the NYPD Patrol Guide in August 2023.[22]

*Fall 2023-Spring 2024: The NYPD Doubles Down*

339.    Chase and collision statistics from the months following Chief Pontillo's August 2023 forced resignation and leading up to the Officer Defendants ramming Plaintiff with their police car on May 26, 2024 illustrate the extent the NYPD doubled down on Defendant Chell's policy changes after suppressing criticism from within its own ranks.

340.    September 2023 saw the NYPD engage in 118 vehicle chases, with 32 ending in collisions. For comparison, prior to Defendant Chell's policy changes, September 2021 saw only thirteen chases and six collisions, while September 2022 saw only fifteen chases and three collisions.

341.    October 2023 saw the NYPD engage in 195 vehicle chases, with 24 ending in collisions. For comparison, prior to Defendant Chell's policy changes, October 2021 saw only sixteen chases and four collisions, while October 2022 saw only 22 chases and five collisions.

342.    November 2023 saw the NYPD engage in 183 vehicle chases, with 32 ending in collisions. For comparison, prior to Defendant Chell's policy changes, November 2021 saw only six chases and three collisions, while November 2022 saw only 32 chases and sixteen collisions.

343.    December 2023 saw the NYPD engage in 179 vehicle chases, with 47 ending in

---

[22] *See* Cuba, J., "The NYPD Doesn't Want You to Know the Official Policy on Police Chases," STREETSBLOG NYC (August 30, 2023), publicly available at:

https://nyc.streetsblog.org/2023/08/30/the-nypd-and-its-main-watchdog-dont-want-you-to-know-the-official-policy-on-police-chases.

collisions. For comparison, prior to Defendant Chell's policy changes, December 2021 saw only eight chases and five collisions.

344.    January 2024 saw the NYPD engage in 227 vehicle chases, with 44 ending in collisions. For comparison, prior to Defendant Chell's policy changes, January 2021 saw only ten chases and five collisions, while January 2022 saw only fifteen chases and five collisions.

345.    February 2024 saw the NYPD engage in 208 vehicle chases, with 40 ending in collisions. For comparison, prior to Defendant Chell's policy changes, February 2021 saw only three chases and six collisions, while February 2022 saw only nineteen chases and twelve collisions.

346.    March 2024 saw the NYPD engage in 163 vehicle chases, with 34 ending in collisions. For comparison, prior to Defendant Chell's policy changes, March 2021 saw only eleven chases and six collisions, while March 2022 saw only eleven chases and eight collisions.

347.    April 2024 saw the NYPD engage in 166 vehicle chases, with 33 ending in collisions. For comparison, prior to Defendant Chell's policy changes, April 2021 saw only seven chases and one collision, while April 2022 saw only twelve chases and five collisions.

348.    May 2024—the month the Officer Defendants rammed Plaintiff—saw the NYPD engage in 164 vehicle chases, with 34 ending in collisions. For comparison, prior to Defendant Chell's policy changes, May 2021 saw only eight chases and six collisions, while May 2022 saw only thirteen chases and three collisions.

349.    Figure 17 is a true and accurate graph depicting these and other statistics, drawn from a December 16, 2024 article by Haidee Chu and Yoav Gonen for *The City* titled *More Than a Crash a Day as NYPD Keeps Pedal to the Metal on Car Chases*.[23] Yellow designates chases and blue designates collisions.

---

[23] Publicly available at: https://www.thecity.nyc/2024/12/16/nypd-police-car-crashes-chases/.



*Figure 17*

*January 2025: NYPD Commissioner Jessica Tisch Implements Some Reform Too Late for Plaintiff*

350.    On January 15, 2025, NYPD Commissioner Jessica Tisch announced a new "vehicle pursuits" policy making "critical changes" to existing policies.[24]

351.    Commissioner Tisch explained that these changes were necessary because "our officers deserve clear guidance" and "[t]he NYPD's enforcement efforts must never put the public or the police at undue risk, and pursuits . . . can be both potentially dangerous and unnecessary."[25]

352.    Commissioner Tisch explained *"**Now**, our cops will have clear, unambiguous

---

[24] "Commissioner Tisch Announces New NYPD Vehicle Pursuit Policy," NYPD (January 15, 2025), publicly available at:

https://www.nyc.gov/site/nypd/news/pr004/commissioner-tisch-new-nypd-vehicle-pursuit-policy#:~:text=Changes%20to%20the%20NYPD's%20vehicle,%2C%20or%20non%2Dviolent%20m isdemeanors.

*See also* Gonen, Y., "New NYPD Commissioner Reverses Course on Deadly Vehicle Pursuits," THE CITY (January 12, 2025), publicly available at:

https://www.thecity.nyc/2025/01/15/nypd-jessica-tisch-police-car-chases/.

[25] *Id.*

parameters for when to initiate, continue, and terminate these pursuits."[26] (Emphasis added.)

353.    The policy changes initiated by Commissioner Tisch include, among other things, limiting officers' discretion to initiate vehicle pursuits, expanded supervision over pursuits, and the institution of monthly reviews for pursuits.

354.    Commissioner Tisch also informed NYPD officers, for what appears to be the first time, "Officers will not be the subject of criticism or disciplinary action if they terminate the pursuit because they do not believe it can be continued safely."[27]

355.    These changes represent small steps in the right direction. But they came too late for Plaintiff.

*Defendants Gevargiz and Burckhard Only Received Vehicle Pursuit Training After Ramming Plaintiff With Their Police Car*

356.    The NYPD did not give Defendant Gevargiz its "Vehicle Pursuits" training until January 30, 2025—nine months after he and Defendant Burckhard chased Plaintiff with his police car and ran him over.

357.    The NYPD did not give Defendant Burckhard its "Vehicle Pursuits" training until January 30, 2025—nine months after he and Defendant Gevargiz chased Plaintiff with his police car and ran him over.

### *The NYPD Has a Policy of Failing to Discipline Officers, Like Defendant Chell and the Officer Defendants, Who Have Repeatedly Committed Civil Rights Violations*

358.    It was no accident that Defendant Chell, the Officer Defendants, and the Doe Defendants were entrusted with the power to ruin Plaintiff's life on May 26, 2024. It was the predictable and inevitable consequence of a policy choice.

359.    As of May 26, 2024, Defendant City had an unconstitutional policy, custom, or usage of failing to discipline NYPD officers and officials who have committed civil rights

---

[26] *Id.*

[27] *Id.*

violations.

360.    This policy, custom, or usage was characterized by, among other things:

a.    failing to discipline NYPD officers and officials who committed civil rights violations;

b.    ordering and encouraging NYPD officers and officials to cover up civil rights violations committed by fellow officers and subordinates;

c.    disciplining and criticizing NYPD officers and officials who refused to cover up civil rights violations committed by fellow officers and subordinates;

d.    failing to train NYPD officers and officials on the circumstances in which discipline for civil rights violations must or may be imposed;

e.    vesting NYPD officers and officials with too much discretion in deciding when to discipline fellow officers and subordinates for civil rights violations;

f.    failing to investigate circumstances in which NYPD officers and officials committed civil rights violations or covered up civil rights violations committed by fellow officers and subordinates;

g.    assisting NYPD officers and officials who committed civil rights violations in covering up wrongdoing; and

h.    rewarding NYPD officers and officials who cover up civil rights violations committed by fellow officers and subordinates (collectively, "**Discipline Policies**").

361.    The constitutional violations caused by the Discipline Policies were widespread, persistent, and ongoing as of May 26, 2024.

362.    Defendants City and Chell knew that their Discipline Policies had resulted in constitutional violations before May 26, 2024, not least because officers, like the Officer Defendants, who have previously escaped discipline for serious misconduct can reasonably expect that they will be able to do so again.

363.    Defendants City and Chell knew to a moral certainty that their Discipline Policies would continue to result in constitutional violations before May 26, 2024.

364.    Despite knowing that their Discipline Policies had resulted in constitutional violations before May 26, 2024 and would obviously continue to do so, Defendants City and Chell failed to change their Discipline Policies or take appropriate action to prevent or sanction the

violations of constitutional rights caused by their Discipline Policies.

365.    Instead, Defendants City and Chell ignored, tolerated, and ratified the constitutional violations caused by their Discipline Policies; made no meaningful attempt to prevent future violations; and consciously adopted a policy of inaction in face of them.

366.    Defendants City and Chell were deliberately indifferent to the constitutional rights of New Yorkers, like Plaintiff, who were adversely impacted by their Discipline Policies.

367.    The Discipline Policies were the moving force behind Plaintiff's injuries.

368.    On August 12, 2013, Judge Shira A. Scheindlin, a federal district judge for the United States District Court for the Southern District of New York, issued a 195-page opinion and order finding that the NYPD's use of stop-and-frisk was unconstitutional and that the NYPD had an illegal policy of racially profiling Black and Latinx New Yorkers.[28]

369.    On September 23, 2024, Judge Analisa Torres, a federal district judge for the United States District Court for the Southern District of New York overseeing the NYPD's stop-and-frisk cases,[29] published 503-page report reviewing the NYPD's disciplinary system ("Discipline Report"[30]).

370.    The Discipline Report was written by New York State Supreme Court Judge James Yates (ret.) after extensive investigation.

371.    Among many other things, the Discipline Report concluded:

a.  The NYPD's disciplinary system fails to hold officers accountable for stop, frisk, or search related misconduct.

b.  The NYPD's disciplinary system gives too much discretion to the NYPD and the Police Commissioner to decide whether or not to discipline officers, which results in little to no accountability for officer misconduct.

---

[28] *See Floyd, et al. v. City of New York*, No. 08 Civ. 1054, Dkt. 373 (SDNY), publicly available at: https://law.justia.com/cases/federal/district-courts/new-york/nysdce/1:2008cv01034/320470/373/.

[29] *Floyd, et al. v. City of New York*, No. 08 Civ. 1054 (SDNY); *Ligon, et al. v. City of New York, et al.*, No. Civ. 2274 (SDNY); and *Davis, et al. v. City of New York, et al.*, No. 10 Civ. 699 (SDNY).

[30] Publicly available at: https://www.nypdmonitor.org/wp-content/uploads/2024/09/Discipline-Report.pdf.

c. The NYPD's disciplinary system is mostly hidden from the public, and would be improved by increased transparency and community involvement.

d. The NYPD's disciplinary system is not centralized, which results in inefficient and inconsistent misconduct investigations and outcomes.

e. Complaints against officers are sometimes split into investigations on separate tracks between the NYPD and the CCRB, where the agencies do not regularly share critical information. This creates inconsistencies in investigations and outcomes even though the separate investigations are based on the same police encounter.

f. The Police Commissioner's final authority over officer discipline undermines the process of holding officers accountable for their misconduct.

372. The Discipline Report echoes many of the findings in the final report of the Mollen Commission to Investigate Allegations of Police Corruption and the Anti-Corruptions Procedures of the Police Department, which was issued 30 years prior.[31]

373. Plaintiff incorporates the five-page summary of the Discipline Report here.[32]

374. The NYPD also has a long history of failing to discipline officers for improper and excessive uses of force specifically.

375. New Yorkers filed over 1,000 complaints of excessive force before the CCRB as a result of the 2020 racial justice protests following the death of George Floyd.[33]

376. The CCRB concluded that at least 66 of these complaints involved force that was improper, excessive, or unnecessary enough for the NYPD to administer the most severe level of discipline, which at minimum calls for the loss of eleven vacation days.

377. Only five of the relevant officers received a penalty of more than ten lost vacation

---

[31] Mollen Comm'n Final Report (July 7, 1994), publicly available at:

www.nyc.gov/assets/doi/images/content/timeline/MollenCommissionNYPD.pdf.

[32] Publicly available at: https://ccrjustice.org/sites/default/files/attach/2024/11/2024.11.12_-_Summary of the Discipline Report Final.pdf.

[33] *See* Gonen, Y., "Almost Every NYPD Cop Charged with Excessive Force During the George Floyd Protests Escaped Serious Punishment," THE CITY (June 3, 2025), publicly available at:

https://www.thecity.nyc/2025/06/03/nypd-excessive-force-discipline-george-floyd-protests/?utm_medium=email&utm_campaign=DAILY_060325&utm_source=ActiveCampaign&mc_cid=311a3a7318&mc_eid=f330e54aa0.

days.

378.    27 of the relevant officers received a penalty of ten or fewer lost vacation days.

379.    26 of the relevant officers received no discipline at all.

380.    As the interim chief of the CCRB observed: "As we reflect on the five years since George Floyd's murder, the low rate of discipline for officers found to have used excessive force at protests remains both disappointing and concerning[.]"[34]

### *Defendants Engaged in a Conspiracy*

381.    Defendants engaged in a civil conspiracy and common scheme that connects and links each Defendant with each of the causes of action alleged herein.

382.    Defendants conspired among themselves to cover up the unlawful acts committed against Plaintiff before, during, and after his unlawful seizure.

383.    Defendants carried out many intentional overt acts in furtherance of their conspiracy to violate Plaintiff's rights and cover up their misconduct. These acts include, without limitation:

      a.   using a police car as a weapon without legal justification;

      b.   refusing to wear or activate body worn cameras;

      c.   fabricating evidence;

      d.   falsely reporting that Plaintiff struck the police car by accident;

      e.   falsely reporting that Plaintiff ran in front of the police car;

      f.   falsely reporting that Plaintiff ran into the side of the police car;

      g.   making, or causing to be made, false statements in official paperwork;

      h.   making, or causing to be made, false statements to the KCDA;

      i.   making, or causing to be made, false and defamatory statements to the media;

      j.   confining, handcuffing, shackling, and intimately surveilling Plaintiff without probable cause, consent, or other legal justification for over 44 days without

---

[34] *Id.*

presenting him for arraignment or seeking indictment;

k.   sharing Plaintiff's confidential health information;

l.   refusing to intervene in deprivations of Plaintiff's rights;

m.   refusing to report the acts and omissions of co-defendants to the CCRB or other appropriate agencies;

n.   discriminating against Plaintiff because of his disabilities; and

o.   punishing Plaintiff prior to any adjudication of guilt.

***

## FIRST CAUSE OF ACTION
### Excessive Force (42 U.S.C. § 1983)
### *Against Officer Defendants and Doe Defendants*

384.   Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

385.   The Officer Defendants and Doe Defendants willfully and intentionally subjected Plaintiff to physical force, including deadly physical force, in excess of what was reasonable under the circumstances without a reasonable basis to believe that such conduct was appropriate, reasonable, lawful, or necessary.

386.   The foregoing conduct proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

387.   The foregoing conduct was malicious, oppressive, willful, wanton, reckless.

388.   The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

## SECOND CAUSE OF ACTION
### False Arrest (42 U.S.C. § 1983)
### *Against Officer Defendants and Doe Defendants*

389.   Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

390.   The Officer Defendants and Doe Defendants caused Plaintiff to be seized, arrested,

and detained without probable cause to believe that Plaintiff had committed any crime, a reasonable basis to believe such cause existed, or any lawful privilege, and Plaintiff was aware of this detention and did not consent to it.

391.    The foregoing conduct proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

392.    The foregoing conduct was malicious, oppressive, willful, wanton, reckless.

393.    The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

### THIRD CAUSE OF ACTION
### Unconstitutional Conditions of Confinement (42 U.S.C. § 1983)
### *Against Doe Defendants*

394.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

395.    The Doe Defendants intentionally subjected Plaintiff to unconstitutional conditions of confinement, including by handcuffing, shackling, and intimately surveilling Plaintiff for over 44 continuous days; recklessly failed to act with reasonable care to mitigate the risk that these conditions posed to Plaintiff, though they knew or should have known that these conditions posed an excessive risk to Plaintiff's health and safety; and were otherwise deliberately indifferent to Plaintiff's Fourteenth Amendment rights.

396.    The foregoing conduct proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

397.    The foregoing conduct was malicious, oppressive, willful, wanton, reckless.

398.    The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

**FOURTH CAUSE OF ACTION**
**Excessive Pre-Arraignment Delay and Detention (42 U.S.C. § 1983)**
*Against Doe Defendants*

399.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

400.    The Doe Defendants unreasonably delayed Plaintiff's arraignment and presentation before a neutral magistrate and detained Plaintiff without arraigning or indicting him, and this unreasonable delay was illegitimately motivated by ill will and delay for delay's sake.

401.    The foregoing conduct proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

402.    The foregoing conduct was malicious, oppressive, willful, wanton, reckless.

403.    The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

**FIFTH CAUSE OF ACTION**
**Fabrication of Evidence (42 U.S.C. § 1983)**
*Against Officer Defendants and Doe Defendants*

404.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

405.    The Officer Defendants and Doe Defendants fabricated information likely to influence a jury's verdict and forwarded that information to prosecutors.

406.    The foregoing conduct proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

407.    The foregoing conduct was malicious, oppressive, willful, wanton, reckless.

408.    The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

## SIXTH CAUSE OF ACTION
### Abuse of Criminal Process (42 U.S.C. § 1983)
### *Against Officer Defendants and Doe Defendants*

409.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

410.    The Officer Defendants and Doe Defendants employed criminal process to compel performance or forbearance of some act with intent to do harm to Plaintiff without excuse or justification and in order to obtain a collateral objective outside the legitimate ends of criminal process.

411.    The foregoing conduct proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

412.    The foregoing conduct was malicious, oppressive, willful, wanton, reckless.

413.    The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

## SEVENTH CAUSE OF ACTION
### Failure to Intervene (42 U.S.C. § 1983)
### *Against All Defendants Except Defendant City*

414.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

415.    Defendant Chell, the Officer Defendants, and the Doe Defendants had a duty to intervene to prevent their fellow defendants' violations of Plaintiff's constitutional rights and failed to so intervene despite having reasonable opportunities to do so.

416.    The foregoing conduct proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

417.    The foregoing conduct was malicious, oppressive, willful, wanton, reckless.

418.    The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this

action.

### EIGHTH CAUSE OF ACTION
### Civil Rights Conspiracy (42 U.S.C. § 1983)
### *Against All Defendants Except Defendant City*

419.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

420.    Defendant Chell, the Officer Defendants, and the Doe Defendants agreed among themselves to act in concert to deprive Plaintiff of his clearly established constitutional rights, and undertook multiple overt acts in furtherance of that shared goal, including without limitation the acts listed in ¶ 383 above.

421.    The foregoing agreement and conduct proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

422.    The foregoing agreement and conduct was malicious, oppressive, willful, wanton, reckless.

423.    The foregoing agreement and conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

### NINTH CAUSE OF ACTION
### *Monell* – Unlawfully Weaponizing Police Vehicles (42 U.S.C. § 1983)
### *Against Defendant City*

424.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

425.    Defendant City has a policy, custom, or usage of unlawfully weaponizing police vehicles and using them in inappropriate chases.

426.    The foregoing policy, custom, or usage was a moving force behind the violation of Plaintiff's rights.

427.    The foregoing policy, custom, or usage proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

428.    In addition or in the alternative, Defendant City is liable for the unlawful actions of the Defendant Chell and the Doe Supervisors in their capacities as municipal policymakers.

429.    The foregoing policy, custom, or usage entitles Plaintiff to compensatory damages in an amount to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

### TENTH CAUSE OF ACTION
### *Monell* – Failure to Discipline (42 U.S.C. § 1983)
### *Against Defendant City*

430.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

431.    Defendant City has a policy, custom, or usage of failing to discipline NYPD officers and officials who have committed civil rights violations.

432.    The foregoing policy, custom, or usage was a moving force behind the violation of Plaintiff's rights.

433.    The foregoing policy, custom, or usage proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

434.    In addition or in the alternative, Defendant City is liable for the unlawful actions of the Defendant Chell and the Doe Supervisors in their capacities as municipal policymakers

435.    The foregoing policy, custom, or usage entitles Plaintiff to compensatory damages in an amount to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

### ELEVENTH CAUSE OF ACTION
### Disability Discrimination – ADA (42 U.S.C. § 12131 et seq.)
### *Against Defendant City*

436.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

437.    Plaintiff is a "qualified individual with a disability" within the meaning of 42 U.S.C. § 12131(2).

438.    Defendant City and its NYPD are "public entit[ies]" within the meaning of 42

U.S.C. § 12131(1)(A) and (B), respectively, and operate public services, programs, and activities, including law enforcement.

439.    Acting through the NYPD, Defendant City denied Plaintiff the benefits of said services, programs, and activities, and subjected Plaintiff to unlawful discrimination by failing to provide reasonable accommodations for his disabilities and unlawfully holding Plaintiff in indefinite confinement for over 44 days without due process and in unconstitutional conditions of confinement while refusing to arraign him or seek indictment, including by handcuffing and shackling Plaintiff to his bed and intimately surveilling him from inside his hospital room.

440.    Defendant City was aware that its existing policies and practices made it substantially likely that disabled individuals like Plaintiff would be denied their protected rights under the Americans with Disabilities Act in the course of encounters with the NYPD, and acted with deliberate indifference in failing to act to prevent or mitigate the denial of those rights.

441.    The foregoing violations of Title II of the Americans with Disabilities Act were a but for cause of Plaintiff's injuries, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

442.    The foregoing conduct was malicious, oppressive, willful, wanton, reckless.

443.    The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

**<u>TWELFTH CAUSE OF ACTION</u>**
**Disability Discrimination – NYCHRL (N.Y.C. Admin. Code § 8-107(4))**.
***Against Defendant City and Doe Defendants***

444.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

445.    Plaintiff is an "aggrieved person" with a "disability" within the meaning of N.Y.C. Admin. Code §§ 502(a) and 8-102.

446.    Defendant City and its NYPD are "covered entitit[ies]," "employer[s]" and "provider[s] of public accommodation" within the meaning of N.Y.C. Admin. Code § 8-102, and

operate public services, programs, and activities, including law enforcement.

447.    The Doe Defendants are "agent[s] and "employee[s]" of Defendant City within the meaning of N.Y.C. Admin. Code § 8-107(4).

448.    Acting through the NYPD and Doe Defendants, Defendant City denied Plaintiff the benefits of said services, programs, and activities, and subjected Plaintiff to unlawful discrimination by failing to provide reasonable accommodations for his disabilities and unlawfully holding Plaintiff in indefinite confinement for over 44 days without due process and in unconstitutional conditions of confinement while refusing to arraign him or seek indictment, including by handcuffing and shackling Plaintiff to his bed and intimately surveilling him from inside his hospital room.

449.    Defendant City was aware that its existing policies and practices made it substantially likely that disabled individuals like Plaintiff would be denied their protected rights under the New York City Human Rights Law in the course of encounters with the NYPD, and acted with deliberate indifference in failing to act to prevent or mitigate the denial of those rights.

450.    The foregoing violations of the New York City Human Rights Law proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

451.    The foregoing conduct was malicious, oppressive, willful, wanton, reckless.

452.    The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

## THIRTEENTH CAUSE OF ACTION
### Deprivation of Rights (N.Y.C. Admin. Code § 8-801 *et seq.*)
### *Against All Defendants Except Defendant Chell*

453.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

454.    The Officer Defendants and Doe Defendants willfully and intentionally subjected Plaintiff to physical force in excess of what was reasonable under the circumstances, and seized,

detained, and arrested Plaintiff without probable cause and without a reasonable basis to believe such cause existed.

455.    Plaintiff is a "person aggrieved" within the meaning of N.Y.C. Admin. Code § 8-801.

456.    The Officer Defendants and Doe Defendants are "covered individuals" within the meaning of N.Y.C. Admin. Code § 8-801.

457.    Defendant City is the "employer" of the Officer Defendants and Doe Defendants within the meaning of N.Y.C. Admin. Code § 8-803(b).

458.    The foregoing conduct proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

459.    The foregoing conduct was malicious, oppressive, willful, wanton, reckless.

460.    The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

**FOURTEENTH CAUSE OF ACTION**
**Assault & Battery**
***Against All Defendants***

461.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

462.    The Officer Defendants and Doe Defendants caused harmful or offensive contact with Plaintiff without legal justification or consent, causing Plaintiff injury and placing him in imminent apprehension of such a contact.

463.    Defendant City is liable for the conduct of the Officer Defendants and Doe Defendants under the doctrine of *respondeat superior*.

464.    Defendant Chell and the Doe Supervisors are liable for the conduct of the Doe Officers under the doctrine of *respondeat superior*.

465.    The foregoing conduct proximately caused injury to Plaintiff, including physical

and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

466.    The foregoing conduct was malicious, oppressive, willful, wanton, reckless.

467.    The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

**FIFTEENTH CAUSE OF ACTION**
**False Arrest (Common Law)**
***Against All Defendants***

468.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

469.    The Officer Defendants and Doe Defendants caused Plaintiff to be seized, arrested, and detained without probable cause to believe that Plaintiff had committed any crime, a reasonable basis to believe such cause existed, or any lawful privilege, and Plaintiff was aware of this detention and did not consent to it.

470.    Defendant City is liable for the conduct of the Officer Defendants and Doe Defendants under the doctrine of *respondeat superior*.

471.    Defendant Chell and the Doe Supervisors are liable for the conduct of the Doe Officers under the doctrine of *respondeat superior*.

472.    The foregoing conduct proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

473.    The foregoing conduct was malicious, oppressive, willful, wanton, reckless.

474.    The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

## SIXTEENTH CAUSE OF ACTION
### Defamation *Per Se* (Common Law)
### *Against Defendant Chell and Defendant City*

475.   Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

476.   Defendant Chell made and published the false statements described above about Plaintiff, a private person, with actual malice and knowledge of their falsity or a reckless disregard of the same, and these statements, charging Plaintiff with a serious crime, were defamatory *per se* and exposed Plaintiff to public contempt, hatred, ridicule, aversion, disgrace.

477.   Defendant City is liable for the conduct of Defendant Chell under the doctrine of *respondeat superior*.

478.   The foregoing conduct proximately caused injury to Plaintiff, including reputational harm, emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

479.   The foregoing conduct was actually malicious, oppressive, willful, wanton, reckless.

480.   The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

## SEVENTEENTH CAUSE OF ACTION
### Negligence / Negligent Infliction of Emotional Distress / Negligent Hiring, Retention, Training, and Supervision
### *Against All Defendants*

481.   Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

482.   Defendant Chell, the Officer Defendants, and the Doe Defendants acted carelessly, recklessly and negligently when they injured Plaintiff by engaging in the wrongful conduct described herein and thereby breached the duty of care they owed Plaintiff.

483.   Defendant City is liable for the conduct of Defendant Chell, the Officer Defendants, and the Doe Defendants under the doctrine of *respondeat superior*.

484.    Defendant Chell and the Doe Supervisors are liable for the conduct of the Doe Officers under the doctrine of *respondeat superior*.

485.    Defendant City knew, or should have known in the exercise of reasonable care, the propensities of Defendant Chell, the Officer Defendants, and the Doe Defendants to engage in the wrongful conduct herein described, and failed to use reasonable care in the hiring, training, retention, and supervision of Defendant Chell, the Officer Defendants, and the Doe Defendants.

486.    Defendant City knew, or should have known in the exercise of reasonable care, the propensities of the Officer Defendants to use excessive force, fabricate evidence, make false arrests, discriminate on the basis of race, fail to exercise reasonable care in the operation of police vehicles, and engage in the other wrongful conduct described herein.

487.    Defendant City knew, or should have known in the exercise of reasonable care, the propensities of Defendant Chell to make defamatory, inflammatory, and unprofessional statements about victims of police violence and engage in the other wrongful conduct described herein.

488.    Defendant City knew, or should have known in the exercise of reasonable care, the propensities of the Doe Defendants to use excessive force, fabricate evidence, make false arrests, discriminate on the basis of race and disability, and engage in the other wrongful conduct described herein.

489.    Defendants Gevargiz and Burckhard had a duty to operate their police vehicle with reasonable care.

490.    Defendants Gevargiz and Burckhard were negligent, careless, reckless, deliberately indifferent in operating their police car.

491.    Defendant City negligently entrusted Defendants Gevargiz and Burckhard with the police car that they used to strike Plaintiff.

492.    The foregoing conduct proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his

constitutional rights.

493.    Plaintiff suffered a serious injury within the meaning of New York State Insurance Law § 5102(d).

494.    The foregoing conduct was malicious, oppressive, willful, wanton, reckless.

495.    The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

**<u>EIGHTEENTH CAUSE OF ACTION</u>**
**Violations Of New York State Constitution (Art. I §§ 1, 5, 6, 11, and 12)**
***Against All Defendants***

496.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

497.    By and through the conduct described above, Defendant Chell, the Officer Defendants, and the Doe Defendants violated Plaintiff's rights secured by Art. I §§ 1, 5, 6, 11, and 12 of the New York State Constitution.

498.    These state constitutional provisions are self-executing.

499.    Defendant City is liable for the conduct of Defendant Chell, the Officer Defendants, and the Doe Defendants under the doctrine of *respondeat superior*.

500.    Defendant Chell and the Doe Supervisors are liable for the conduct of the Doe Officers under the doctrine of *respondeat superior*.

501.    The foregoing conduct proximately caused injury to Plaintiff, including physical and emotional injuries, mental anguish, economic loss, deprivation of liberty, and loss of his constitutional rights.

502.    The foregoing conduct was malicious, oppressive, willful, wanton, reckless.

503.    The foregoing conduct entitles Plaintiff to compensatory and punitive damages in amounts to be fixed by a jury, and to reasonable attorney's fees, costs, and disbursements of this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court grant the following relief:

A. Compensatory damages in an amount to be determined at trial;

B. Punitive damages against all Defendants except Defendant City in an amount to be determined at trial;

C. Injunctive relief in the correction and retraction of Defendant Chell's defamatory statements and return of Plaintiff's personal property;

D. Reasonable costs and attorneys' fees under 42 U.S.C. §§ 1988 and 12205, N.Y.C. Admin. Code. § 8-502, or other applicable law;

E. Pre- and post-judgment interest to the fullest extent permitted by law; and

F. Any additional relief the Court deems just and proper.

DATED:  New York, New York
        June 12, 2025

LIAKAS LAW, P.C.
*Attorneys for Plaintiff*
40 Wall Street, 50th Floor
New York, New York 10005
Tel: (212) 937-6655

_____
Cassandra Rohme
Adam Strychaluk